# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | | |
|---|---|---|
| **JOHN BRADLEY RAY,** | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:16CV00030 |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | |
| **JAMIE STAPLETON ROCK,** | ) | By: James P. Jones |
| | ) | United States District Judge |
| Defendant. | ) | |

*Robert T. Copeland, Copeland Law Firm, P.C., and Michael A. Bragg, Bragg Law, PLC, Abingdon, Virginia, for Plaintiff; James N. L. Humphreys, Hunter, Smith & Davis, LLP, Kingsport, Tennessee, for Defendant.*

In this personal injury case arising out of a motorcycle accident, a jury found in favor of the plaintiff and awarded $4,509 in damages. The plaintiff has moved for a new trial on the ground that the jury award is inadequate as a matter of law. For the reasons stated below, I will deny the motion.

I.

The evidence presented at trial persuaded the jury that defendant Jamie Stapleton Rock, while driving a minivan, had negligently turned in front of plaintiff John Bradley Ray, causing Ray's motorcycle to collide with the side of the minivan. The evidence pertaining to Ray's damages can be summarized as follows.

Following the accident on August 25, 2014, Ray was transported by the ambulance to the emergency department at Bristol Regional Medical Center ("BRMC"). BRMC records of this visit show that Ray was diagnosed with a contusion of the chest wall and painful respiration. According to the records, he reported no loss of consciousness, dizziness, headaches, or altered mental status. An X ray showed no definite rib fracture.

Several weeks before the accident Ray was seen at Associated Neurologists of Kingsport ("Neurologists") in order to follow up on a diagnosis of optic neuritis. One of his close relatives has multiple sclerosis ("MS"), which puts Ray at greater risk of developing MS, and optic neuritis can sometimes be an early symptom of MS. Otakar Krcal, M.D., a neurologist, determined that Ray did not suffer from MS at that time.

Ray returned to Neurologists on October 2, 2014, a little more than a month after the accident. He was seen by Nurse Practitioner Tracie Price. A record of this visit states that Ray reported that he had lost consciousness at the time of the accident, but he denied having memory problems. He reported experiencing headaches approximately four times per week since the accident, including severe headaches about two times per week. Price found that his cognition was normal and diagnosed him with post-concussive headaches.

Ray first complained of memory loss to Neurologists in May of 2015. He wrote the complaint on an office intake form but did not discuss the problem with a medical practitioner at that time. On September 9, 2016, approximately two years after the accident, Ray first reported to Nurse Practitioner Price that he had short term memory problems and difficulty organizing his thoughts. Price performed a Montreal Cognitive Assessment that day, which showed mild cognitive decline. Ray underwent a magnetic resonance imaging scan ("MRI") with contrast, and the results were within normal limits. Lab work revealed slightly elevated liver enzymes but otherwise normal results. According to Price, on March 1, 2017, Ray again complained of memory problems as well as trouble sleeping. He reported to her that he had to write notes to himself to remember what he was doing.

Dr. Krcal testified that Ray was still being monitored for development of MS and that it was difficult to separate the treatment necessitated by the accident from the monitoring required for MS. Dr. Krcal stated that Ray was probably followed more closely than a typical patient with post-concussive syndrome.

Dr. Krcal testified that Ray's headaches following the accident could have "possibly" resulted from post-concussive syndrome. Ray reported to the physician that his headaches had resolved by his second office visit following the accident. Dr. Krcal could not say with any certainty that Ray's memory problems were caused by the accident, largely because there was no baseline memory testing from

before the accident that would provide a comparison. Dr. Krcal testified that he was not aware of anything else that would have caused Ray to suffer memory loss. According to Dr. Krcal, post-concussive memory loss does not usually worsen a year after an accident. Rather, most memory problems following a concussion resolve within the first few weeks or months, although they sometimes last longer.

Ken Smith, M.D., a neurosurgeon, performed an independent medical examination of Ray at the request of the defense. Dr. Smith noted that the MRI taken approximately two years after the accident was normal. He acknowledged that Ray claimed memory loss, but he could not say that it was caused by the accident because there was no pre-accident data for comparison. Dr. Smith noticed that Ray exhibited a flat affect, meaning that he did not give much feedback in his interactions and was slow to respond. However, Dr. Smith could not say that the flat affect was caused by the accident. He testified that he could not reach an opinion to a reasonable degree of medical certainty based solely on anecdotal evidence.

Kimberly Campbell, Ray's former girlfriend, lived with him at the time of the accident. She testified that he had appeared dazed when she saw him in the hospital and had complained that his head and side were hurting. He was unable to drive for about a week following the accident. He experienced painful breathing, which led to additional medical visits. Campbell testified that Ray had suffered

from pneumonia and broken ribs, and his head hurt so bad that he underwent an MRI.

Campbell stated that Ray's personality had changed after the accident. He used to be very punctual and outgoing, but after the accident, he was short-tempered, argumentative, and forgetful. He stopped caring about things and wanting to do things. He became disorganized and messy. Nevertheless, he still managed to pay his bills on time and was only late in paying two bills. He did not hire a housekeeper, but Campbell helped him with housekeeping for a while after the accident.

The defendant, Ms. Rock, testified that she had not seen Ray lose consciousness at the scene of the accident. Rock stated that after the impact, Ray had appeared at the door of her minivan almost immediately, talking to her.

Ray testified that he works for a power company as a unit operator, a job with great responsibility and safety concerns. He is still able to perform his job despite his alleged injuries, and he has not been criticized or disciplined at work since the accident. He missed five 12-hour workdays because of the accident.

Ray claimed a brief loss of consciousness after the accident. He said he remembered turning off the motorcycle's ignition and talking to the defendant. He recalled seeing child seats in the minivan. He was discharged from BRMC the same day that the accident occurred. He testified that he did not remember being

asked questions in the emergency room or stating whether or not he lost consciousness.

When he was discharged from the hospital, Ray had significant pain in his ribs and experienced a headache that night. He could not breathe normally the next day, and his ribs and side hurt. Two days following the accident, he visited an urgent care center because of his rib pain. He had a severe, productive cough accompanied by wheezing and pain. According to Ray, he was diagnosed with a rib fracture and pneumonia. With treatment, his breathing normalized within a week or so, but his ribs continued to hurt for while.

Ray visited a general practitioner and then a chiropractor for his rib pain. He stated that the rib pain was the worst pain he had ever experienced. He was unable to obtain records from the chiropractor's office, which is no longer in business, so he did not seek to recover amounts paid to the chiropractor. He saw the chiropractor for six to eight months. At some point after his treatment ended, he felt a "pop" in his rib cage and experienced pain again, but he was able to relieve the pain using stretching and relaxation techniques that the chiropractor had taught him.

Ray testified that after the accident, he had suffered from two to six headaches per week and migraines at least twice a week. The headaches continued for six months to a year, but their frequency decreased and they became more

manageable. In the year before the trial in this case, he had suffered about two migraines.

Ray stated that he began to notice memory loss six months to a year after the accident. He missed bill payments, forgot about functions, and forgot to take his lunch with him to work. He described an incident in which he forgot to send a birthday gift to his one-year-old grandson even though the gift was packaged and addressed, and his grandson shares a birthday with his son. Ray did not realize he had forgotten to mail the gift until his son asked him about it. Following the accident, he became less tolerant, which affected his relationship with Campbell and ultimately lead to their romantic separation. He stated that his memory loss scared him because it caused him to be alone and made him worry that he might lose his job or be unable to function independently. He admitted that he had been divorced twice before the accident.

Ray claimed the following special damages:

- $404 billed by the Bristol Life Saving Crew;
- $1,605 billed by BRMC;
- $3,905 billed by Holston Valley Medical Center for an MRI and $471 billed by Holston Valley Imaging Center for X rays of the cervical spine;

- $1,818 billed by Wellmont Medical Associates for office visits, X rays, and injections apparently related to rib pain;
- $825 billed by Associated Neurologists of Kingsport; and
- $2,058.60 in lost wages.

II.

Rule 59(a) of the Federal Rules of Civil Procedure provides that after a jury trial, the court may grant a new trial "on all or some of the issues – and to any party." Pursuant to Federal Rule of Civil Procedure 59(a), I should grant a new trial if I am "'of the opinion that [1] the verdict is against the clear weight of the evidence, or [2] is based upon evidence which is false, or [3] will result in a miscarriage of justice.'" *Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996) (quoting *Aetna Cas. & Sur. Co. v. Yeatts*, 122 F.2d 350, 352-53 (4th Cir. 1941)). The grant or denial of a motion for a new trial is entrusted to the sound discretion of the district court. *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

"In deciding whether a jury's award is . . . inadequate, a federal court in a diversity case must apply substantive state law." *Stebbins v. Clark*, 5 F. App'x 196, 201 (4th Cir. 2001) (unpublished); *see also Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 419 (1996) (holding that application of state law regarding inadequacy of jury verdict does not contravene Seventh Amendment). In ruling on

the plaintiff's motion, I may weigh the evidence and assess the credibility of witnesses. *Cline*, 144 F.3d at 301.

As a general rule, "the amount of damages is solely within the discretion of the jury." *Stebbins*, 5 F. App'x at 202. The court must afford great respect to the jury's verdict and cannot set it aside merely because the court would have arrived at a different amount. *Id.* Nevertheless, a Virginia statute states that a court may grant a new trial "where the damages awarded are too small as where they are excessive." Va. Code Ann. § 8.01-383.

In Virginia, "a jury's award of damages may not be set aside by a trial court as inadequate or excessive unless the damages are so excessive or so small as to shock the conscience and to create the impression that the jury has been influenced by passion or prejudice or has in some way misconceived or misinterpreted the facts or the law which should guide them to a just conclusion." *Downer v. CSX Transp., Inc.*, 507 S.E.2d 612, 614 (Va. 1998). The Supreme Court of Virginia has attempted to clarify the standard for determining whether a jury verdict in a personal injury case is inadequate as a matter of law. When a jury's award represents the exact amount of medical expenses and special damages claimed by the plaintiff, the award is inadequate as a matter of law because it fails to compensate the plaintiff for noneconomic damages such as pain, suffering, and inconvenience. *Bowers v. Sprouse*, 492 S.E.2d 637, 638 (Va. 1997). However,

this rule "does not extend to an award which deviates from the amount of all the special damages claimed, even if the amount of the verdict corresponds to an identifiable portion of the special damages." *Walker v. Mason*, 510 S.E.2d 734, 735 (Va. 1999).

Moreover, "[w]hen the evidence permits a jury to conclude that only some of the damages claimed resulted from the accident, a verdict in an amount less than or approximating a portion of the special damages does not justify the conclusion that the jury failed to consider other damage elements such as pain, suffering, and inconvenience." *Richardson v. Braxton-Bailey*, 510 S.E.2d 732, 733 (Va. 1999). "The quality of the evidence is dispositive, not a comparison between the amount of the verdict and the special damages claimed." *Id.*

More recently, in *Herring v. Johnson*, an unpublished opinion, the Supreme Court of Virginia held that where a portion of the plaintiff's claimed special damages were uncontroverted and the jury awarded damages in the exact amount of those uncontested damages, the verdict was inadequate as a matter of law because it failed to compensate the plaintiff for non-monetary damages. Record No. 140417, 2014 WL 11398557, at *2 (Va. Dec. 12, 2014) (unpublished) (citing *Bradner v. Mitchell*, 362 S.E.2d 718, 720 (Va. 1987)).

Applying these principles, I must determine which of the plaintiff's claimed special damages were uncontroverted and whether the jury's award exactly

matches the total amount of those uncontroverted special damages. The defendant did not contest the $404 billed by the Bristol Life Saving Crew or $1,605 billed by BRMC for services rendered on the day of the accident. The defendant did not contest the plaintiff's lost wages in the amount of $2,058 for the five days of work he missed following the accident. These items of damages total $4,067, which is $441.40 less than the jury's verdict.

I cannot speculate about what the additional $441.40 awarded by the jury represents. The evidence presented at trial called into question whether the other claimed special damages were caused by the accident. Although Ray contended that he had suffered a rib fracture and pneumonia, no medical records or expert testimony corroborated that claim. Hospital records showed that an X ray performed on the day of the accident did not reveal a rib fracture. No expert witness could causally tie Ray's claimed memory loss or headaches to the accident within a reasonable degree of medical certainty. Some if not all of the treatment Ray received from his neurologist, as well as the MRI, would have been required even had the accident not occurred, because he needed to be monitored for the potential onset of MS. Aside from Ray's own vague testimony about medical visits for treatment of rib pain, no witness explained the Wellmont Medical Associates bills or linked them to the accident, nor did any witness explain the Holston Valley Imaging Center bill for what appears to be an X ray of the cervical

spine. In short, the medical evidence presented in this case was extremely weak, and the jury had good reason to conclude that Ray had not met his burden of proving that all of his claimed damages were caused by the accident. Therefore, I cannot find that the jury's verdict was inadequate as a matter of law.

III.

For the foregoing reasons, it is **ORDERED** that the Motion for Additur or In the Alternative a New Trial, ECF No. 78, is DENIED.

ENTER: November 28, 2017

/s/ *James P. Jones*
United States District Judge